UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| SUZANNE BROWN, )<br>)<br>Petitioner )<br>)<br>v. )<br>)<br>KIMBERLY RIEGER, et al., )<br>)<br>Respondents ) | 2:22-cv-00259-JAW |

**RECOMMENDED DECISION ON 28 U.S.C. § 2241 PETITION**

Pursuant to 28 U.S.C. § 2241, Petitioner, in execution of a federal sentence and currently under the supervision of the District of Maine Probation Office, seeks release from home confinement to start her term of supervised release. (Petition, ECF No. 1.) Petitioner claims the First Step Act of 2018 (FSA), Pub. L. No. 115-391, entitles her to more credits toward early release than the Bureau of Prisons (BOP) has calculated. (*Id.*; Supporting Brief, ECF No. 18; Supplemental Supporting Briefs, ECF Nos. 24, 24-1.) The Government opposes the petition. (First Response Letter, ECF No. 6; Second Response Letter, ECF No. 9, Response Brief, ECF No. 20; Supplemental Response Brief, ECF No. 25.)

After a review of the parties' arguments and the record, I recommend the Court deny the petition.

## BACKGROUND

In January 2017, Petitioner was convicted in another district on twelve counts of making material false statements to a federal agency in violation of 18 U.S.C. § 1001(a)(2).

(Petitioner's Declaration ¶ 1, ECF No. 1-1.)[1]  Petitioner is a former United States Marine Corps Captain with an Honorable Discharge, and she maintains her innocence of the crimes of conviction.  (*Id.* ¶¶ 2, 11.)  In June 2018, Petitioner was sentenced to twelve months incarceration to be followed by two years of supervised release.  (*Id.*)  Due to good behavior and a lack of prior convictions, in September 2020, Petitioner was removed from post-trial supervision upon a New Hampshire probation officer's motion; the Government did not contest the motion.  (*Id.* ¶¶ 9–10.)  Petitioner was ordered to report to Federal Detention Center Philadelphia on January 3, 2022.  (*Id.* ¶ 3.)  She reported as ordered and there were no behavioral incidents during her time in custody.  (*Id.* ¶ 9.)

"To encourage inmates to participate in [evidence-based recidivism reduction] programs and productive activities," the First Step Act of 2018 (FSA) created a new system of credits that can provide prisoners with an earlier start to pre-release custody or supervised release.  *Carroll v. Warden of FCI Berlin Robert Hazlewood*, No. 21-CV-139-PB, 2021 WL 2877463, at *1 (D.N.H. May 26, 2021); 18 U.S.C. § 3632(d).[2]  Eligible prisoners earn either ten or fifteen days of FSA credits for each thirty days of "successful participation" in qualifying programs and activities.  18 U.S.C. § 3632(d)(4)(A).

On January 19, 2022, shortly after Petitioner began serving her sentence, BOP issued a final regulation and began implementing the new FSA credit system.  87 Fed. Reg.

---

[1] Petitioner's uncontested factual allegations are accepted as true for purposes of analyzing her petition.

[2] The new FSA credits are sometimes called "earned time credits," "FSA Time Credits," or "FTCs," and operate separately from other "credit" systems, such as good time credits and credits for completing the Residential Drug Abuse Program, used to calculate the portion of an imposed sentence that a prisoner will serve in prison.

2705; 28 C.F.R. Part 523.  BOP intended to implement an automated system for calculating FSA credits, but in the meantime, BOP established interim procedures to implement the final rule.  (First BOP Response Letter at 2.)  Under the interim procedures, BOP performed an initial calculation of FSA credits for prisoners with upcoming release dates.  (*Id.*)  As of the date of her initial calculation, March 2, 2022, BOP calculated that Petitioner was entitled to fifteen FSA credits based on her participation in qualifying programs and activities.  (*Id.*)

Petitioner was informed that, as of March 23, 2022, she was eligible for release to home confinement pursuant to the CARES Act, Pub. L. 116–136 (2020).  (Petitioner's Declaration ¶ 5.)  Ordinarily, the statutory maximum period of placement in home confinement is "the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months," 18 U.S.C. § 3624(c)(2), but during the declared national emergency period, the CARES Act permitted the Director of the BOP, "if the Attorney General finds that emergency conditions will materially affect the functioning of the [BOP]," to extend that cutoff "as the Director determines appropriate." Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (2020).

Because of a seventeen-year-old warrant and charges from the Riverside, California District Attorney, Petitioner was not released to home confinement in March 2022. (*Id.* ¶¶ 5–6.)  In April 2022, Petitioner commenced the BOP administrative remedy process, asserting that BOP failed to follow proper procedures and invoke the Interstate Agreement on Detainers upon her admittance to FDC Philadelphia.  (*Id.* ¶ 6.)  Following a June 2022 hearing in Indio, California, the warrant was rescinded, and the charges were dismissed.

3

(*Id.* ¶ 7.) After an initial rejection in July 2022, which Petitioner contends was erroneous, BOP began reprocessing Petitioner's release. (*Id.* ¶¶ 6–8.)

On August 2, 2022, Petitioner was released to home confinement under the supervision of the District of Maine Probation Office. (Petitioner's Declaration ¶ 8.) Petitioner was provided with an Individualized Needs Plan Program Review, which contained a list of her programs and activities qualifying for FSA credits, (ECF No. 1-4), and a Sentence Monitoring Calculation sheet, which contained, among other information, the following details:

> Home Detention Eligibility Date: 11-12-2022
> Final Statutory Release for Inmate: 01-01-2023
>     With FSA credits: 15 days
> The inmate is projected for release: 12-17-2022

(ECF No. 1-3).

On August 8, 2022, Petitioner emailed two BOP addresses inquiring about her FSA credits and asserting that her release date should be September 2, 2022. (*Id.* ¶ 16; Emails, ECF No. 1-5.) Petitioner had estimated her release date based on her contention that she had accumulated ninety days of FSA credits from February 2022 through July 2022 and would acquire another fifteen credits during August 2022. (*Id.*) When she was in custody at FDC Philadelphia, Petitioner made similar inquiries but was told to contact other BOP offices and was unable to obtain an answer to her inquiries. (Petitioner's Declaration ¶ 15.)

On August 9, 2022, the Philadelphia Residential Reentry Management Office replied to her email, asserting that she had received a "one-time application of retroactive FSA [credits] under the interim procedures" and that she would not receive another.

(Emails at 1.) Rather, BOP intended to use "the information regarding ongoing credit when considering the [residential reentry centers]/[home confinement] placement recommendation." (*Id.*) The email from BOP also specified that when the system for ongoing calculations was implemented, Petitioner's situation would be "reviewed and [FSA credits] will be adjusted consistent with the rules language and the implementation procedures," but there was "no additional information" for Petitioner at that time and there was no "expected time frame for implementation/resolution." (*Id.*)

Petitioner contacted her probation officer, who informed Petitioner that the Probation Office had no ability to calculate FSA credits. (Petitioner's Declaration ¶ 17.) On August 22, 2022, Petitioner contacted the director's office of the Pharos House, a residential reentry center in Portland, Maine, but Petitioner was informed that the facility could not calculate her FSA credits and that it would probably be Petitioner's "best bet" to petition the Court. (*Id.* ¶ 18.) On August 24, 2022, Petitioner filed her § 2241 petition.

In response to an inquiry from the Probation Office, a senior attorney for the BOP Northeast Regional Office wrote:

> Once an inmate's time credit is calculated it will not be recalculated again by the agency until the automated system is implemented, so, under the interim guidance, Petitioner's calculation will remain at 15 days at the moment despite her eligibility to continue to earn additional credit each month since her initial FSA calculation review on March 2, 2022. Once the automated system is "live" Petitioner's FSA credits will be updated to include any additional FSA credit she is entitled to, that was not already included in the initial calculation. Thus, as of today, her anticipated release date remains December 17, 2022.

(Status Report, ECF No. 6.) According to the BOP attorney, because there were no eligible programming or activities available to prisoners on home confinement, Petitioner would

5

not be able to earn further credits after August 2, 2022, but after the automated system came online, she would receive credit for all of her eligible programming and activities between January 3, 2022 and August 2, 2022, not merely the programming activities between January 3, 2022 and March 2, 2022. (*Id.*)  According to the BOP attorney, even assuming Petitioner had participated in eligible programming on every single day she was incarcerated, she would be entitled to 106 days of FSA credits, which would make her release date September 17, 2022. (*Id.*)

Because the BOP attorney claimed that the system for making her final calculation update would be implemented by September 14, 2022, which was before the attorney's most-charitable estimation of Petitioner's FSA credits, I ordered the Probation office to provide another update on September 15, 2022. (Order, ECF No. 7.)  On September 15, 2022, BOP informed the Court that the automated system had not come online as anticipated. (Status Report, ECF No. 9.)  However, BOP's Correctional Program Division in Washington, DC had manually updated Petitioner's credit calculation pursuant to the interim procedures. (*Id.*)  BOP asserted that Petitioner had earned ninety days of FSA credits through August 2, 2022, when she was placed in home confinement. (*Id.*)  Fifteen of those FSA credits were "applied toward her statutory release date of January 1, 2023 – resulting in an earlier release from service of her 12-month term on December 17, 2022 . . . ." (*Id.*)  The other seventy-five FSA credits were "accounted for" within the 137 days of prelease custody (home confinement) that Petitioner would serve between August and December 17, 2022. (*Id.*)

6

On October 21, 2022, Petitioner filed her brief in support of the petition.[3] (Supporting Brief, ECF No. 18.) Petitioner argued that she was placed on home confinement pursuant to the CARES Act, not pursuant to any FSA credits, because as of August 2, 2022, BOP had repeatedly asserted that Petitioner was only entitled to fifteen FSA credits and therefore would not be eligible for home confinement that early. (*Id.*) On October 31, 2022, the Government filed its brief in response to the petition, and citing 28 C.F.R. § 542.10 et seq., BOP argued that the petition should be dismissed for failure to exhaust administrative remedies. (Brief in Response, ECF No. 20.)

On November 14, 2022, in supplemental briefing, Petitioner argued that although prisoners must ordinarily exhaust administrative remedies before challenging credit determinations, if Petitioner was correct, her release date would have lapsed well before the usual ninety-day multi-tiered administrative process could be completed. (Supplemental Supporting Briefs, ECF Nos. 24, 25.) The BOP Correctional Program Administrator for the Northeast Regional Office asserted that BOP's automated calculation system became operative on or about October 9, 2022, and attached a new FSA Time Credit Assessment sheet. (Stokes Declaration and Attachments at 1, 5, ECF No. 25.) The FSA Time Credit Assessment sheet contained, among other information, the following details:

> Period Start/Stop: 01-03-2022 to 10-08-2022
> Accrued Pgm Days: 255
> Disallowed Pgm Days: 23
> FTC Towards RRC/HC: 65

---

[3] Between September 15, 2022, and October 31, 2022, the parties litigated a motion for a temporary restraining order and preliminary and permanent injunctions. The Court determined that Petitioner had not carried her burden to establish that she was entitled to those forms of extraordinary relief. (Recommended Decision, ECF No. 13; Order, ECF No. 17.)

7

        FTC Towards Release.: 15
        …
        Time Credit Factor: 10
        Time Credits 80

(*Id.* at 5.) BOP explained that Petitioner's FSA eligible program days did not include the first twenty-three days of her incarceration, when she did not participate in eligible programs or activities because she was assigned to the Special Housing Unit, but because she was already on home confinement when the calculation was performed in October 2022, Petitioner received a windfall of credits for those days on home confinement. (*Id.* at 3.) The new Sentence Monitoring Computation Data sheet was dated November 7, 2022, but it was otherwise similar to the August 2, 2022 version, which was based on and contained the March 2, 2022 interim calculation. (*Id.* at 9.)

## LEGAL STANDARD

Under the general statute codifying the writ of habeas corpus, 28 U.S.C. § 2241, relief extends only to a petitioner who "is in custody in violation of the Constitution or laws or treaties of the United States." That provision "establishes a mechanism for a federal inmate who is 'in custody' to challenge the execution of (rather than the imposition of) his or her sentence." *Francis v. Maloney*, 798 F.3d 33, 36 (1st Cir. 2015); *see also*, *United States v. Wilson*, 503 U.S. 329, 335, 112 S. Ct. 1351, 1355, 117 L. Ed. 2d 593 (1992). Typical examples of challenges to the execution of a sentence properly brought in a § 2241 petition include certain parole decisions and revocations of jail time credits. *Francis*, 798 F.3d at 36–37; *Rogers v. United States*, 180 F.3d 349, 358 (1st Cir. 1999).

"[A] § 2241 petition is properly brought in the district court with jurisdiction over the prisoner's custodian (unlike a § 2255 petition, which must be brought in the sentencing court)." *United States v. Barrett*, 178 F.3d 34, 50 n.10 (1st Cir. 1999); *See also*, *Rumsfeld v. Padilla*, 542 U.S. 426, 442–47 (2004) (discussing the traditional rule that § 2241 challenges to the execution of a sentence, rather than the validity of a conviction and sentence, may only be brought in the "district of confinement").

## DISCUSSION

**A.     Exhaustion**

For state prisoners challenging the legality of their convictions or the imposition of their sentences, § 2254 contains a requirement that petitioners exhaust all available state court remedies before seeking relief in federal court. 28 U.S.C. § 2254(b), (c). Even explicit statutory exhaustion requirements only apply when remedies are practically "available," and the Supreme Court has recognized that there are at least "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Ross v. Blake*, 578 U.S. 632, 643 (2016).

> First . . . an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. . . . Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it. . . . And finally, the same is true when prison administrators

9

> thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.

*Id.* at 643–44. And because the § 2254 exhaustion requirement does not represent "a jurisdictional limitation, . . . a state may waive the defense of nonexhaustion." *Pike v. Guarino*, 492 F.3d 61, 71 (1st Cir. 2007).

Although § 2241 contains no statutory exhaustion requirement like the one found in the text of § 2254, federal courts have generally imposed a similar requirement on prisoners pursuing federal habeas relief though § 2241, unless there are "unusual circumstances." *Benson v. Superior Ct. Dept. of Trial Ct. of Mass.*, 663 F.2d 355, 358 (1st Cir. 1981). The Supreme Court has long cautioned, however, that the non-statutory § 2241 exhaustion requirement is designed to be somewhat flexible:

> The [§ 2241] exhaustion doctrine is a judicially crafted instrument which reflects a careful balance between important interests of federalism and the need to preserve the writ of habeas corpus as a swift and imperative remedy in all cases of illegal restraint or confinement. It cannot be used as a blunderbuss to shatter the attempt at litigation of constitutional claims without regard to the purposes that underlie the doctrine and that called it into existence.

*Braden v. 30th Jud. Cir. Ct. of Kentucky*, 410 U.S. 484, 490 (1973) (internal quotation marks and citation omitted).

For federal prisoners challenging the legality of their convictions or the imposition of their sentences, § 2255 does not contain a statutory exhaustion requirement, but federal prisoners are required to complete any previously initiated direct appeal process before initiating a collateral attack via a § 2255 motion. *United States v. Gordon*, 634 F.2d 638, 638 (1st Cir. 1980); *United States v. Weekes*, 611 F.3d 68, 72 (1st Cir. 2010). Most federal

10

courts have also generally required federal prisoners challenging the execution of their sentences to exhaust all available administrative remedies before pursuing § 2241 habeas relief. *Shorter v. Warden*, 803 F. App'x 332, 336 (11th Cir. 2020) ("In general, a [federal] § 2241 petitioner must exhaust available administrative remedies before she can obtain relief in federal court"); *Rogers v. United States*, 180 F.3d 349, 358 (1st Cir. 1999) ("Once administrative remedies are exhausted, prisoners may then seek judicial review of any jail-time credit determination by filing a habeas petition under 28 U.S.C. § 2241") (internal citations omitted).

"[W]here Congress has not clearly required exhaustion," issues of federal administrative exhaustion requirements are governed by "sound judicial discretion," *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992), and federal courts, therefore, "have some leeway to relax this requirement." *Anversa v. Partners Healthcare Sys., Inc.*, 835 F.3d 167, 176 (1st Cir. 2016). "In determining whether exhaustion is required, federal courts must balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion." *McCarthy*, 503 U.S. at 146.

"Courts have recognized exceptions to the § 2241 exhaustion requirement when exhausting administrative appeals would be futile, or when the appeals process would be inadequate to prevent irreparable harm." *Carroll v. Warden of FCI Berlin Robert Hazlewood*, No. 21-CV-139-PB, 2021 WL 2877463, at *2 (D.N.H. May 26, 2021) (quotation marks and citations omitted). And "[f]ailure to exhaust these administrative remedies may be excused . . . where the failure is due to the administrator, rather than the

11

petitioner." *Fox v. Hazelwood*, No. 21-CV-159-PB, 2022 WL 2907992, at *1 (D.N.H. July 22, 2022) (quotation marks and citations omitted).

Here, Petitioner has a legitimate argument that she was not required to exhaust the ordinary BOP appeals system. First, the apparent uncertainty of the administrative process suggests that the process might have been practically unavailable to Petitioner, who was told to contact various BOP offices around the country to obtain an updated FSA credit calculation and who was then placed in home confinement far from her facility of incarceration. Second, before her release, on multiple occasions, Petitioner was evidently given mistaken or incomplete information from BOP and other federal officials regarding the process, the timeline for calculating and recalculating her FSA credits, and the best way for her to obtain relief. Third, as the timeline of events reflects, the delays and confusion in obtaining an accurate count of Petitioner's FSA credits is attributable to BOP's interim procedures and decisions surrounding its automated system; any delay is not the result of any lack of diligence by Petitioner.

Finally, the three-tiered administrative appeals system, which typically takes more than ninety days to complete due to the in-built response times at each stage in the process, was most likely inadequate to prevent irreparable harm in the event Petitioner was even partially correct about her entitlement to additional FSA credits towards early supervised release. Given her relatively short sentence and given the relatively brief period between the resolution of her warrant issue and her placement in home confinement and the issuance of the disputed Sentence Monitoring Calculation sheet, Petitioner had far less than ninety days to avoid being kept in custody longer than she believed she was entitled. For example,

12

even using BOP's latest calculation of eighty FSA credits rather than Petitioner's contention of more than one hundred FSA credits, if Petitioner was correct that all her FSA credits should be applied toward early supervised release because she had already been placed in home confinement pursuant to the CARES Act, the eighty FSA credits would have made her release date October 13, 2022. The administrative process alone was likely to take ninety days, which would have exceeded the October date.

Under the circumstances of this case, exhaustion would not be an impediment to Petitioner's ability to obtain relief if she is otherwise entitled to relief.

**B.     BOP's Discretion Regarding Prelease Custody and Supervised Release**

The parties' central dispute focuses on the difference between the number of FSA credits applied toward early home confinement and the number of FSA credits applied toward early supervised release.  On March 2, 2022, BOP calculated fifteen total FSA credits and applied them to early supervised release to estimate a release date of December 17, 2022.  BOP now calculates that Petitioner is entitled to eighty FSA credits.[4]  Instead of

---

[4] Petitioner previously asserted she believed she was entitled to more than one hundred total credits and has not conceded that her total credits should be as low as the latest BOP calculation of eighty credits. However, Petitioner has not refuted BOP's contentions that she did not participate in eligible programming and activities during her initial time in the Special Housing Unit and that she received but was not truly entitled to certain credits while she was placed in home confinement.  BOP, however, has not explained why its September 2022 manual calculation resulted in ninety credits, whereas its latest calculation resulted in only eighty credits.

The Government acknowledges that Petitioner has produced evidence suggesting that she participated in some programming and activities that might not have been reflected in the most recent automated calculation.  Accordingly, the Government admits that Petitioner may be entitled to more than eighty FSA credits and that other courts have ordered BOP to perform manual calculations in similar circumstances.  However, because the material issue does not appear to be the total FSA credits, but rather the portion applied toward early supervised release as contrasted with the portion applied toward early home confinement, Petitioner does not appear to have been prejudiced by any discrepancy between the totals,

13

applying eighty credits toward early supervised release, which would have resulted in Petitioner's release in mid-October 2022, BOP's latest determination applied the same number of credits toward early supervised release as its March 2, 2022, calculation—fifteen days. BOP applied the remaining FSA credits—sixty-five days—toward early home confinement. Petitioner's expected release date of December 17, 2022, therefore, remained the same despite the increase in her FSA credits.

Petitioner's confusion and frustration are understandable. Because she had already been placed in home confinement, she arguably received no benefit from the sixty-five credits BOP retroactively applied toward early home confinement. Had she not already been in home confinement in part due to temporary measures resulting from the COVID-19 pandemic, the sixty-five days of early home confinement would have been beneficial and consistent with the statute's purpose of providing an incentive to participate in eligible programming and activities.

While Petitioner is understandably disappointed given the unique circumstances of her case, BOP's decision is not necessarily unreasonable. The decision to release certain prisoners to home confinement early pursuant to the CARES Act resulted from emergency conditions at BOP facilities; it does not appear to have been intended to provide a benefit to the released prisoners. If BOP regularly or unreasonably capped the credits it applied toward supervised release in a way that made significant portions of FSA credits redundant,

---

whether the true number is eighty, ninety, or over one hundred. Therefore, it is likely unnecessary for the Court to order another manual calculation to determine Petitioner's total FSA credits.

14

the BOP arguably would undermine the objectives of the FSA, which objectives include providing a strong incentive for prisoners to participate in qualifying programming and activities. Because the early home confinement decisions made pursuant to the CARES Act were temporary emergency measures, the retroactive allocation of FSA credits to home confinement for some individuals, like Petitioner, does not necessarily undermine the statute's objective.

Ultimately, the issue for the Court is whether Petitioner's continued confinement is lawful. The specific question is whether BOP had the discretion to allocate Petitioner's FSA credits as it did in this case.

The relevant provision of the FSA provides that "Time credits . . . shall be applied toward time in prerelease custody or supervised release. The Director of the Bureau of Prisons shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C). Section 3624(g) defines "prelease custody" to include home confinement and residential reentry centers, and it provides eligibility criteria for prelease custody, including a demonstrated reduced risk of recidivism and a lack of danger to society.

There is only one criterion in § 3624(g) that might provide guidance on BOP's ability to allocate Petitioner's FSA credits between early home confinement and early supervised release. Section 3624(g)(2)(A)(iv) provides: "Except as provided in paragraph (4), a prisoner who is placed in home confinement shall remain in home confinement until the prisoner has served not less than 85 percent of the prisoner's imposed term of imprisonment." For Petitioner's twelve-month sentence, eighty-five percent would have

15

elapsed in mid-November 2022. That fact was likely reflected in the line within Petitioner's August Sentencing Monitoring Computation sheet specifying that her "Home Detention Eligibility Date" was November 12, 2022. Paragraph (4), in turn, provides that when setting the conditions of prelease custody, the BOP Director shall, "to the extent practicable, provide that increasingly less restrictive conditions shall be imposed on prisoners who demonstrate continued compliance with the conditions of such prerelease custody, so as to most effectively prepare such prisoners for reentry."

A review of the relevant provisions reveals that BOP would likely have violated the statute if BOP attempted to apply a higher proportion of Petitioner's FSA credits toward early supervised release than permitted by statute, and terminated Petitioner's home confinement earlier than November 8, 2022. In other words, depending on the length of the sentence and the number of FSA credits, there could be a maximum level of FSA credits the BOP is permitted to apply toward early supervised release.

Arguably, the § 3624(c)(2) cap for ordinary home confinement placements based on the lesser of six-months or ten percent of the sentence could also limit BOP's discretion in allocating FSA credits between early prelease custody or early supervised release. For example, without the pandemic, under § 3624(c)(2), Petitioner would ordinarily not have been eligible for home confinement until late November 2022 (approximately thirty-seven days before the end of her sentence). Assuming she was entitled to more FSA credits than thirty-seven days, such as the eighty days BOP now contends she earned, BOP presumably would not have been able to place her on home confinement at the time her FSA credits were to be applied, and the credits would have to be applied towards early supervised

16

release. In that event, the § 3624(g)(2)(A)(iv) requirement that a prisoner remain on home confinement until she has served eighty-five percent of her sentence would simply not apply because it only covers "a prisoner who is placed in home confinement . . . ." On the other hand, it is also arguable that § 3624(c)(2) and § 3624(g)(2)(A) provide entirely separate bases for home confinement and therefore do not overlap or interact.

The Court, however, does not have to resolve those issues. Because the CARES Act lifted the § 3624(c)(2) restriction, BOP was able to place Petitioner in home confinement in August, well before late November without any potential violation or conflict with that provision. Because Petitioner was not released from home confinement before mid-November, prior to serving eighty-five percent of her sentence, there is no violation or conflict with § 3624(g)(2)(A)(iv). Petitioner has not pointed to any other criteria or requirement that BOP might have violated by allocating most of her FSA credits to home confinement rather than early supervised release. There does not appear to be any specific requirement for BOP to allocate a minimum amount of FSA credits toward early supervised release in Petitioner's case.

Congress has generally given BOP broad authority when making placement decisions, and when faced with statutes using discretionary language, courts have generally concluded that there is no role for courts to second-guess BOP's determinations. *See* 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court"); *Tapia v. United States*, 564 U.S. 319, 331 (2011) (noting that, with limited statutory exceptions, BOP has "plenary control" over decisions like the "place of the prisoner's imprisonment" and

17

"treatment programs (if any) in which he may participate"); *United States v. Black*, No. 2:07-cr-00029-GZS, 2022 WL 1487035, at *2 n.3 (D. Me. May 11, 2022) (noting that courts generally lack the authority to review BOP placement decisions). In this case, the statute grants BOP considerable discretion in the allocation of FSA credits between prelease custody and early supervised release. In the absence of a directive restricting BOP's discretion in this context, despite the somewhat unique circumstances of Petitioner's case, Petitioner has not established that she is entitled to the relief she seeks.

## CONCLUSION

Based on the foregoing analysis, I recommend the Court deny the petition.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, on or before November 22, 2022. A responsive memorandum shall be filed by November 25, 2022.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 18th day of November, 2022.